# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

EDWARD DEWAYNE HODGES,

        Defendant.

Case No. 24-cr-106-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## I.  INTRODUCTION

On November 19, 2024, the Grand Jury returned an Indictment charging Defendant with one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8).  (Doc. 3.)

The matter before me is Defendant's motion to suppress, and supplement to motion to suppress.  (Docs 26 and 28.)  The supplement contained an inventory of items to be suppressed which includes all statements made by Defendant after he was removed from his apartment building on September 6, 2024. (Doc. 28.)  The Government's Resistance states, "[t]he government clarified with defendant that he is seeking suppression of all statements made after defendant entered his apartment building after the initial conversation with law enforcement in front of another door to the apartment complex."  (Doc. 34 at 2)

The Government timely filed a response to the motion.  (Doc. 34.)  The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on March 12, 2025.  (Doc. 35.)

1

At the hearing, the following Government exhibits were admitted without objection:

1.     Video from inside Officer Mosher's police vehicle;

2.     Body camera footage from Officer Mosher; and

3.     Body camera footage from Officer McAtee.

The Government called the following witnesses:  Cedar Rapids Police Officer Cody Mosher[1] and Cedar Rapids Police Officer Benjamin McAtee.[2]  I found the witnesses credible.

At the hearing the following Defendant's exhibits were admitted without objection:

A.     Body camera footage from Officer McAtee;

B.     Body camera footage from Officer Mosher;

C.     Body camera footage from Officer Mosher;

D.     Body camera footage from Officer McAtee; and

E.     Body camera footage from Officer McAtee.

At the hearing, the parties were given the opportunity to submit post-hearing supplemental briefs.  The Government timely filed a supplemental brief.  (Doc. 36.)

For the following reasons, I respectfully recommend that the District Court **grant in part and deny in part** Defendant's Motion to Suppress.

## II.     FINDINGS OF FACT

On the evening of September 6, 2024, Officer Mosher and Officer McAtee were dispatched to an apartment complex for a noise disturbance involving two individuals

---

[1] Officer Mosher is currently employed as a patrol officer for the Cedar Rapids Police Department ("CRPD").  He has been employed by the CRPD for approximately 10 years and is a graduate of the Iowa Law Enforcement Academy.

[2] Officer McAtee is currently employed as a patrol officer for the CRPD.  He has been employed by the CRPD for approximately 4.5 years and is a graduate of the Iowa Law Enforcement Academy.

yelling in the parking lot. The apartment complex consisted of two adjoining buildings. When the officers arrived at the complex, they found Defendant and another male individual sitting on the front step of one of the buildings. They were consuming alcohol. Defendant was upset about an incorrect pizza order. Officer Mosher testified that Defendant appeared to be intoxicated.

At approximately the same time as the officers' arrival, Defendant's wife also arrived on the scene with a pizza. Defendant stood up and went to the adjoining building. After Defendant stood up, Officer Mosher observed a set of keys and a firearm in a cloth holster lying on the step immediately in front of where Defendant had been seated. Officer Mosher followed Defendant down the exterior sidewalk to the adjoining building. Officer Mosher observed Defendant through the glass entrance door to the building standing in front of an apartment. Officer Mosher stated "Hey, come here" and motioned for Defendant to exit the building. (Gov. Ex. 2 at 2:55-56.) After about 18 seconds, Defendant exited the building. (*Id.* at 3:14.)

Defendant complained about the pizza order and police harassment for about 38 seconds and then turned to go back into the building. (*Id.* at 3:14-52.) Officer Mosher stopped Defendant from returning into the building and Officer Mosher, assisted by Officer McAtee, placed Defendant in handcuffs. (*Id.* at 3:52-4:29.) Officer Mosher testified that Defendant was detained because the officers were investigating the firearm left on the step, investigating whether Defendant was prohibited from having a firearm, and because Defendant was intoxicated. (Mosher Hr'g Test. at 12.) Officer Mosher explained that Defendant was placed in handcuffs for safety while they investigated. (*Id.*)

After Defendant was placed in handcuffs, Defendant complained that he was being arrested for being drunk in public in front of his house. (Gov. Ex. 2 at 4:00-03.) Officer Mosher stated, "You left your gun over there on the stoop." (*Id.* at 4:03-06.) Defendant responded that the gun belonged to his wife, and she left it there. (*Id.* at 4:05-12.)

3

Officer Mosher stated that gun was in Defendant's possession.  (*Id.* at 4:12.)  Defendant again denied possession of the gun and Officer Mosher said, "You were the one sitting there with it" and "You were sitting on top of it, dude." (*Id.* at 4:12-24.)

Defendant continued to complain and deny possession of the gun.  (*Id.* at 4:24-5:15.)  Officer Mosher asked Defendant, "Outside of being drunk are you allowed to have a gun." (*Id.* at 5:15-17.)  Defendant responded that he was not drunk and then began addressing a variety of topics, including the fact that he works every day, explaining that he was outside having a beer and complaining about an incorrect pizza order, stating that his wife dropped off her gun when she went to obtain the correct pizza, and stating that he had not been convicted of any crimes while living in Cedar Rapids. (*Id.* at 5:17-7:26.)

Officer Mosher commented on Defendant's constant talking, and asked Defendant's wife for her name and birth date, and then asked Defendant, "Are you prohibited, are you a felon or anything like that?" (*Id.* at 7:26-8:41.)  Defendant responded, "No, not in Iowa." (*Id.* at 8:41-43.)  Next, Officer Mosher and Defendant discussed where he was from, and Officer Mosher asked Defendant "Have you been convicted of a felony in Illinois." (*Id.* at 8:43-50.)  Defendant responded "No," and Officer Mosher stated, "You have not been convicted of a felony . . . you've never done prison time or anything like that." (*Id.* at 8:51-55.)  Defendant again responded "No" and said he had never been convicted.  (*Id.* at 8:55-9:01.)  Officer Mosher then asked, "Outside of drinking there is nothing that prohibits you from having a gun." (*Id.* at 9:03-07.)  Defendant responded, "Nothing." (*Id.* at 9:07-08.)  Defendant continued talking about various topics, including whether he could have the handcuffs removed.  Officer Mosher told Defendant not yet because he needed to figure out whether Defendant was prohibited.  (*Id.* at 9:08-10:05.)  Officer Mosher asked Defendant whether he been convicted of domestic abuse, to which Defendant responded, "No." (*Id.* at 10:24-26.)

4

After another 86 seconds, where Defendant rehashed the situation (complaints about the pizza, the gun belonged to his wife, she left the gun with him), Officer Mosher attempted to *Mirandize* Defendant. However, Defendant interrupted Officer Mosher and told Officer Mosher that he did not need to read him his rights unless he was under arrest. Officer Mosher attempted to explain that even though Defendant was not under arrest at that time, because he was detained and not free to leave, Officer Mosher was going to read him his rights. (*Id.* at 11:52-12:53.)

After further talking from Defendant, Officer Mosher placed Defendant under arrest, at that moment for public intoxication, and escorted him to the back seat of his police vehicle. (*Id.* at 12:54-13:51.) While walking to the police vehicle, Defendant told his wife to "contact our lawyer . . . and let him know what is going on." (*Id.* at 13:06-15.) After Defendant was placed in the police vehicle, Officer Mosher read Defendant his *Miranda* rights. (*Id.* at 14:24-52.) After Defendant was *Mirandized*, Officer Mosher asked Defendant, "Having those rights in mind, do you want to tell me what's going on tonight." (*Id.* at 14:54-55.) Defendant replied, "No . . . because I tried to tell you . . . but now I'm under arrest. I have nothing to say." (*Id.* at 14:56-15:06.) In the event, this prediction proved to be incorrect as Defendant had much more to say.

After Defendant had been *Mirandized*, and while Officer Mosher was reviewing Defendant's criminal history, Officer McAtee opened the back of the police vehicle where Defendant was seated and, at Defendant's request, adjusted Defendant's handcuffs. (Gov. Ex. 3 at 18:07-20:34.) After the handcuffs were adjusted, Defendant continued talking, stating generally that he never hurt anyone and insinuating that he was being arrested because he and his wife wanted to protect themselves. (*Id.* at 21:03-37.) Officer McAtee responded, "Part of being a gunowner is you've got to be a responsible one." (*Id.* at 21:38-41.) Defendant continued saying that he wasn't a threat, that his wife dropped the gun at his feet when she went to pick up the correct pizza, and that he forgot

5

it was even there when he initially walked back to his apartment. (*Id.* at 21:42-22:15.) This prompted Officer McAtee to ask whether Defendant was prohibited, whether Defendant was a felon or whether he was a domestic abuser. (*Id.* at 22:15-22.) Defendant denied being prohibited, being a felon, or being a domestic abuser and Officer McAtee closed the door to the police vehicle. (*Id.* at 22:16-35.)

While driving to the police station, Defendant asked Officer Mosher, "So what does your background check say about me?" Officer Mosher responded that Defendant had been charged with several felonies as a juvenile, but he was still determining whether Defendant was convicted of any of the charges. (Gov. Ex. 1 at 24:46-55.) Defendant asked, "What else you got on my juvie record?" Officer Mosher responded that "maybe" there were some charges for stolen cars and Defendant replied, "That's what I did back when I was a kid." (*Id.* at 25:31-49.) After several seconds, Defendant asked "When you all got me a stolen car on your records?" (*Id.* at 26:03-11.) Officer Mosher responded that the timeframe was 1990, 1991 and Defendant responded that he had never been arrested on any felonies in Cedar Rapids and only had traffic violations in Cedar Rapids. (*Id.* at 26:11-26.) After a few moments, Defendant stated, "Let me ask you something. What am I being charged with?" (*Id.* at 26:58-27:05.) Officer Mosher responded "Intox and intox while carrying." (*Id.* at 27:05-10.) Defendant stated that he wasn't carrying a firearm and pointed out that the firearm was on the ground. Officer Mosher stated that the firearm was in Defendant's possession and Defendant responded, "No it wasn't." (*Id.* at 27:11-18.) For the remainder of the car ride, Defendant made various unprompted statements, including asking when his wife would get her gun back, asking whether he could make a phone call outside the 319 area code, statements about working in Iowa and that the jobs in Iowa were better than in other places, stating that some undefined "they" wanted to make him a felon and not wanting him in Cedar Rapids,

6

statements that it was time to leave and find another job, and statements about various people standing behind him. (*Id.* at 27:18-34:06.)

Further facts will be addressed as necessary.

## III. DISCUSSION

### A. Was Defendant subjected to custodial interrogation when he was stopped by officers on his front stoop?

#### 1. Parties' Arguments

Defendant argues that "[a]pplying the relevant Eighth Circuit custody factors to the Defendant's case, the Defendant was in fact in custody when he was seized on his front stoop." (Doc. 26-1 at 8.) Defendant points out that the officers did not clarify whether their questioning was voluntary and did not inform him that he was under arrest. (*Id.*) Defendant also notes that his freedom of movement was restrained. (*Id.*) Further, Defendant asserts that "once the Officers had grown frustrated from their own line of unconstitutional questioning, they arrested the Defendant thereby satisfying the sixth factor of the Eighth Circuit test." (*Id.*) Additionally, Defendant notes that he and the officers were familiar with each other and the officers "exploited" his "gift of gab." (*Id.* at 9.) Defendant contends that when he was being interrogated, "the Officers rarely asked questions"; and, instead, "lodged accusatory statements . . . that naturally made the Defendant feel as if he needed to respond in order to clear his name." (*Id.*) Defendant concludes that the officers "should have reasonably known that the Defendant's penchant for talking made him susceptible to self-incrimination." (*Id.*)

Next, Defendant argues that the officers should have provided him with his *Miranda* rights at the moment he was restrained on his front stoop. (*Id.* at 10.) Defendant contends that "aware that the Defendant was in duress, intoxicated, and an already loquacious individual, the Officers knew they could elicit incriminating statements from the Defendant if they took advantage of the Defendant's vulnerability by using 'question-

7

first' tactics." (*Id.*)  Defendant maintains that asking him "the same question over and over, unsatisfied with the Defendant's assertion that the was not a felon in Iowa," while handcuffed but not under arrest "is exactly the type of relentless and insidious questioning *Miranda* was created to insulate individuals from." (*Id.*)

The Government argues that "Defendant was not in custody until he was told he was under arrest and placed in the patrol vehicle." (Doc. 34-1 at 10.)  The Government maintains that "[p]rior to taking defendant to the police vehicle, the officers' interaction with defendant was consistent with a *Terry* stop which does not trigger the necessity of *Miranda*." (*Id.* at 12.)  The Government asserts that "officers placing defendant in handcuffs did not make this a formal arrest where there are indicators a defendant creates a risk to officers or may flee." (*Id.*)  The Government points out that Defendant was drunk and in possession of a firearm, Defendant was agitated, and Defendant attempted to enter his apartment twice. (*Id.* at 13.)  Under such circumstances, the Government argues that "[t]here were concerns for officer safety and that defendant would flee into his apartment and no Miranda warning was required until defendant's arrest. (*Id.*)

### 2.    *Relevant Law*

"The Fourth Amendment prohibits unreasonable . . . seizures by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (citing *United States v. Cortez,* 449 U.S. 411, 417 (1981); *Terry v. Ohio,* 392 U.S. 1, 9 (1968)) (internal quotations omitted).  Officers may only conduct investigatory stops if they have reasonable suspicion that "criminal activity may be afoot." *Id.* (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)); *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).  Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *Patrick*, 776 F.3d at 954 (quoting *Cortez,* 449 U.S. at 417); *see also United*

*States v. Brown*, 60 F.4th 1179, 1182 (8th Cir. 2023) ("In analyzing whether an officer had reasonable suspicion, [courts] look to the totality of the circumstances.") (Citing *Kansas v. Glover*, 140 S.Ct. 1183, 1191 (2020)). "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." *United States v. Martin*, 15 F.4th 878, 882 (8th Cir. 2021) (quotation omitted); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "In short, the government must point to specific, articulable facts that reasonably suggest a crime." *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (citing *Terry*, 392 U.S. at 27).

"In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ortiz–Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (internal quotation marks and citations omitted). Even innocuous actions may give rise to reasonable suspicion under the totality of the circumstances. *United States v. Condelee,* 915 F.2d 1206, 1209 (8th Cir. 1990) (opining that "there could be 'circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot'") (quoting *Reid v. Georgia,* 448 U.S. 438, 441 (1980)). When justifying a particular stop, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citations omitted).

9

"There is no clear line between investigative stops and de facto arrests." *United States v. Sanford*, 813 F.3d 708, 712 (8th Cir. 2016) (citing *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013)). The Eighth Circuit explained that:

> During a *Terry* stop, officers must use "the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (quoting *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)). "A *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Id*. "As part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop.'" *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (quoting *Newell*, 596 F.3d at 879). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). "In discerning whether [an officer's] actions [meet] the Fourth Amendment's standard of reasonableness, the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger." *Williams v. Decker*, 767 F.3d 734, 740 (8th Cir. 2014).

*Sanford*, 813 F.3d at 713; *see also United States v. Bonilla*, 86 F.4th 1196, 1199 (8th Cir. 2023) ("Officers may use handcuffs during a *Terry* stop if they have 'some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case'") (quoting *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011), in turn quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)); *United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011) ("We have repeatedly held that police officers may reasonably handcuff a suspect . . . during the course of a *Terry* stop in order to protect their safety and maintain the status quo.").

10

The Eighth Circuit has outlined five factors for courts to consider when determining whether a *Terry* stop has risen to the level of an arrest:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Childers*, 73 F.4th 960, 963 (8th Cir. 2023) (quoting *United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022), in turn quoting *Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021)).

"The familiar *Miranda* rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." *United States v. Armstrong*, 39 F.4th 1053, 1056 (8th Cir. 2022). "*Miranda* warnings are required only when a person is in custody, because they are intended to 'protect the individual against the coercive nature of custodial interrogation.'" *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (quoting *United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011), in turn quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). Interrogation "refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "A person is considered to be in custody for the purposes of *Miranda* warnings when there is a 'formal arrest or restraint [on his or her] freedom of movement of the degree associated with formal arrest.'" *United States v. Sandell*, 27 F. 4th 625, 628-29 (8th Cir. 2022) (quoting *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021)).

In *United States v. Pelayo-Ruelas*, 345 F.3d 589 (8th Cir. 2003), the Eighth Circuit provided a clear discussion of the interplay between the principles outlined in *Terry* and the principles outlined in *Miranda*:

> In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a law enforcement officer, prior to conducting custodial interrogation, must advise the suspect of his right to be free from compulsory self-incrimination and to the assistance of counsel. Following *Miranda*, the Supreme Court held in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that a police officer with reasonable suspicion that criminal activity is afoot may briefly detain a suspect to investigate the circumstances giving rise to that suspicion.
>
> In *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), a traffic stop case, the Court discussed the interaction between the custodial interrogation principle of *Miranda* and the brief-detention-to-investigate principle of *Terry*:
>
> > The [*Terry*] stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purpose of *Miranda*.
>
> (Quotation and citation omitted.) Citing *Berkemer*, we have declared that, "No *Miranda* warning is necessary for persons detained for a *Terry* stop." *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir.1986), followed in *United States v. Johnson*, 64 F.3d 1120, 1125–26 (8th Cir.1995), *cert. denied*, 516 U.S. 1139, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996). Thus, we

reject as contrary to this controlling authority [the defendant's] broad contention that a person is in custody for *Miranda* purposes whenever a reasonable person would not feel free to leave. One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights.

*Id.* at 591-92; *see also United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) ("[A] *Terry* stop . . . allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'") (Quoting *Berkemer*, 468 U.S. at 439).

### 3. Analysis

Contrary to Defendant's contention, that he should have been given his *Miranda* rights at the moment he was restrained on his front stoop, *see* Doc. 26-1 at 10, the facts demonstrate that Defendant was detained on his front stoop pursuant to a *Terry* stop, not pursuant to a custodial interrogation. An investigatory stop under *Terry* requires law enforcement officers to have a reasonable suspicion that "criminal activity may be afoot." *Arvizu,* 534 U.S. at 273. Here, Officer Mosher and Officer McAtee were dispatched to an apartment complex parking lot regarding a noise disturbance involving Defendant. After speaking with Defendant, who appeared intoxicated, Defendant stood up from sitting on the stoop and walked to his apartment building. After he stood up, the officers observed a firearm sitting on the step immediately in front of where Defendant had been sitting. Based on the foregoing facts, the officers had reasonable suspicion that "criminal activity may be afoot" and were justified in conducting an investigatory *Terry* stop on Defendant.

Furthermore, given that Defendant appeared intoxicated and in possession of a firearm, Officer Mosher and Officer McAtee were justified in handcuffing Defendant

13

during the investigatory *Terry* stop for officer safety and to maintain the status quo. *See United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011) ("We have repeatedly held that police officers may reasonably handcuff a suspect . . . during the course of a *Terry* stop in order to protect their safety and maintain the status quo.").

Additionally, considering the five factors set forth in *United States v. Childers*, 73 F.4th 960, 963 (8th Cir. 2023), the officers' actions did not rise to the level of an arrest. Only two officers were involved, Defendant was found in possession of a firearm and was intoxicated, the officers' articulable and objective suspicions were strong, and such circumstances required immediate action. Thus, factors one, two, three, and five support finding that the stop did not rise to the level of an arrest. Factor four, observance of erratic behavior and suspicious movements by Defendant is a closer call. Defendant was agitated and intoxicated. His commentary veered from topic to topic and interrupted others. On the other hand, the evidence tends to show that the officers were familiar with Defendant and his behavior was consistent with past interactions. This factor is, at best, neutral and does not support the finding that the *Terry* stop rose to the level of an arrest before the Defendant's arrest was announced.

Moreover, "a *Terry* stop . . . allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *Rodriguez-Arreola*, 270 F.3d at 617 (quoting *Berkemer*, 468 U.S. at 439). Here, after Defendant was placed in handcuffs, Officer Mosher and Defendant had a discussion regarding Defendant's possession of the firearm, which among other things, Defendant denied and stated that the firearm belonged to his wife. (Gov. Ex. 2 at 4:00-5:15.) Officer Mosher asked, "Outside of being drunk are you allowed to have a gun." (*Id.* at 5:15-17.) Defendant responded, among other things, that he was not drunk and that he had not been convicted of any crimes while living in Cedar Rapids. (*Id.* at 5:17-7:26.)

14

After speaking with Defendant's wife, Officer Mosher asked Defendant, "Are you prohibited, are you a felon or anything like that?" (*Id.* at 7:26-8:41.) Defendant responded, "No, not in Iowa." (*Id.* at 8:41-43.) After determining where Defendant was from, Officer Mosher asked Defendant, "Have you been convicted of a felony in Illinois." (*Id.* at 8:43-50.) Defendant responded "No," and Officer Mosher stated, "You have not been convicted of a felony . . . you've never done prison time or anything like that." (*Id.* at 8:51-55.) Defendant again responded "No" and said he had never been convicted. (*Id.* at 8:55-9:01.) Officer Mosher then asked, "Outside of drinking there is nothing that prohibits you from having a gun." (*Id.* at 9:03-07.) Defendant responded "Nothing." (*Id.* at 9:07-08.) Defendant continued talking about various topics and Officer Mosher asked his final question, whether Defendant had been convicted of domestic abuse, to which Defendant responded "No." (*Id.* at 10:24-26.) After approximately 86 more seconds, where Defendant talked about various topics, Officer Mosher attempted to *Mirandize* Defendant. However, Defendant interrupted Officer Mosher and told Officer Mosher that he did not need to read him his rights unless he was under arrest. (*Id.* at 11:52-12:53.) After listening to Defendant continue to talk, Officer Mosher placed Defendant under arrest, at that moment for public intoxication, and escorted him to the back seat of his police vehicle. (*Id.* at 12:54-13:51.)

Defendant asserts that by repeatedly asking him "the same question over and over, unsatisfied with the Defendant's assertion that the was not a felon in Iowa," while handcuffed but not under arrest, Officer Mosher engaged in "exactly the type of relentless and insidious questioning *Miranda* was created to insulate individuals from." (Doc. 26-1 at 10.) I respectfully disagree and find Officer Mosher's questioning well within the purview of a *Terry* stop and a *Miranda* warning was unnecessary. *See Pelayo-Ruelas*, 345 F.3d at 591-92; *see also United States v. Demar*, No. 1:22-CR-00404-ELR-JEM-1, 2024 WL 937052, at *8 (N.D. Ga. Feb. 26, 2024), *Report and Recommendation adopted*,

15

2024 WL 1119388 (N.D. Ga. Mar. 14, 2024) (finding that *Miranda* warnings were unnecessary during a *Terry* stop where a law enforcement officer after observing a firearm in the defendant's possession, asked the defendant whether he was a felon, to which the defendant responded, "yes"); *United States v. Thurman*, No. 1:21-cr-00151-CLC-CHS, 2022 WL 18396271, at * (E.D. Tenn. Dec. 12, 2022), *Report and Recommendation adopted as modified on other grounds*, 2023 WL 315529 (E.D. Tenn. Jan. 19, 2023) (finding that officer's questions during a valid *Terry* stop regarding the contents of the defendant's pockets, whether the defendant shot a gun, why defendant shot a gun, the location of the gun, whether the defendant possessed ammunition, and twice confirmed the defendant was a convicted felon did not require the officer to read the defendant *Miranda* rights and the questions were directly related to the officer's reasonable suspicion that the defendant was a felon in possession of a firearm and/or ammunition); *United States v. Middleton*, No. CRIM.A. CR205-025, 2006 WL 156872, at *3 (S.D. Ga. Jan. 19, 2006) (finding that officer's questioning that included asking whether the defendant was a convicted felon, whether the defendant's rights had been restored, and who owned the gun, were lawful under *Terry*, and the defendant's answers to the questioning, did not violate *Miranda* and were admissible).

Accordingly, based on the foregoing, I find that Officer Mosher's questioning during the valid *Terry* stop did not require *Miranda* warnings before Defendant was arrested; and therefore, I recommend that the motion to suppress as to Defendant's statements in response to Officer Mosher's questioning before Defendant was arrested be denied.

**B.      *Did Defendant waive his* Miranda *rights after he was arrested?***

###      *1.      Parties' Arguments*

Defendant argues that he "unambiguously invoked his right to remain silent." (Doc. 26-1 at 11.)  Defendant asserts that his invocation of the right to remain silent by

telling law enforcement that he did not want to talk to them about what happened is bolstered by the fact that while he was being arrested, and prior to being *Mirandized*, he told his wife to contact their attorney. (*Id.*) Defendant concludes that the "Court should suppress the statements uttered by the Defendant in the back of the police vehicle because he invoked his right to remain silent." (*Id.* at 12.)

The Government argues that "Defendant did not clearly invoke his right to counsel." (Doc. 34-1 at 13.) Specifically, the Government argues that "defendant told his wife to call an attorney, but then immediately asked the officers to listen to him as he continued to talk to them despite a lack of questions from the officers." (*Id.* at 14.) The Government also asserts that "Defendant made admissions that were not in response to interrogation by the officers." (*Id.*) The Government maintains that "[t]he statement of facts, such as defendant was being arrested or was intoxicated or was in possession of a firearm, do not constitute an interrogation." (*Id.* at 16.) The Government contends that the "defendant repeatedly responded to statements by law enforcement with admissions and went on rants where he admitted the firearm was left with him by his wife." (*Id.* at 17.) According to the Government, "[w]hen [the officers] did ask questions, such as requests for information about defendant's criminal history, this did not invoke the [Fifth] Amendment." (*Id.*)

### 2.    *Relevant Law*

"The Fifth Amendment requires suspects to be informed of their *Miranda* rights before any custodial interrogation." *United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016) (citing *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012)). "Interrogation, for *Miranda* purposes, means 'express questioning' and 'words or conduct that officers should know [are] 'reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (alteration in original) (quoting *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004), in turn quoting *Rhode Island v. Innis*, 446 U.S. 291,

301 (1980)). "During an interrogation, '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *United States v. Adams*, 820 F.3d 317, 322-23 (8th Cir. 2016) (alteration in original) (quoting *Miranda*, 384 U.S. at 473–74); *see also Jones*, 842 F.3d at 1083 ("Officers must stop questioning if a suspect clearly and consistently expresses a desire to remain silent."). "'To adequately invoke this right and effectively cut off questioning, a suspect must indicate "a clear, consistent expression of a desire to remain silent."'" *Adams*, 820 F.3d at 323 (quoting *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995), in turn quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir.1989)). "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for purposes of *Miranda*." *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007). A defendant's statements are considered "as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." *Adams*, 820 F.3d at 323 (quotation omitted).

A defendant may waive his or her right to remain silent and such waiver "'can be clearly inferred from the actions and words of the person interrogated.'" *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "'Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.'" *Id.* (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)).

### 3. Analysis

Here, after Defendant was *Mirandized*, Officer Mosher asked Defendant "Having those rights in mind, do you want to tell me what's going on tonight." (Gov. Ex. 2 at 14:54-55.) Defendant replied "No . . . because I tried to tell you . . . but now I'm under arrest. I have nothing to say." (*Id.* at 14:56-15:06.) I find that Defendant's statement

that he had "nothing to say" in response to Officer Mosher's question "do you want to tell me what's going on tonight" is a "a clear . . . expression of a desire to remain silent." *Adams*, 820 F.3d at 323 (quotation omitted). Accordingly, any interrogation of Defendant was required to cease. *See Jones*, 842 F.3d at 1083 ("Officers must stop questioning if a suspect clearly and consistently expresses a desire to remain silent."). Officer Mosher complied and ceased questioning Defendant.

However, Officer McAtee, while Defendant was under arrest, handcuffed, and in the back of the patrol car, and, after Defendant had been *Mirandized* by Officer Mosher, questioned Defendant. Specifically, while Officer Mosher was reviewing Defendant's criminal history, Officer McAtee adjusted Defendant's handcuffs in the back of the patrol vehicle. After the handcuffs were adjusted, Defendant, unprompted, stated generally that he never hurt anyone and insinuated that he was being arrested because he and his wife wanted to protect themselves. (Gov. Ex. 3 at 21:03-37.) Officer McAtee responded to Defendant's statements that, "Part of being a gunowner is you've got to be a responsible one."[3] (*Id.* at 21:38-41.) Defendant continued talking and stated that he wasn't a threat,

---

[3] The context of this statement bears further discussion because, in isolation, one might interpret it as a statement designed to elicit statements from Defendant. The relevant portion of the video starts with Defendant saying, unprompted, "I ain't hurt nobody. . . . Who have I hurt? Who? Who have I assaulted?" (Gov. Ex. 3 at 21:04-22.) Officer McAtee responds, "You haven't assaulted anybody that I know of." (*Id.* at 21:22-24.) Defendant appears to be answering his own question ("Who have I assaulted?"), by stating, "Zero. You listening to me though. Zero. Because me and my wife want to protect ourselves, there's a problem with that. We work every day." (*Id.* at 21:25-38.) Officer McAtee responds to Defendant, stating, "Part of being a gunowner is you've got to be a responsible one." (*Id.* at 21:38-41.) I conclude that Officer McAtee is not asking a question here or making a statement to obtain information. Rather, he seems to simply respond to Defendant. Defendant appears to take it as a question because he states, "What's not responsible about what we're doing?" followed by an explanation of how the gun wound up on the stoop. This information leads directly to Officer McAtee's questions regarding whether Defendant is prohibited, a felon, and/or a domestic abuser, as discussed below. I find "Part of being a gunowner is you've got to be a responsible one" followed by Defendant's explanation does not constitute part of any interrogation. Hence, I am

that his wife dropped the gun at his feet when she went to pick up the correct pizza, and that he forgot it was even there when he initially walked back to his apartment. (*Id.* at 21:42-22:15.) In response to Defendant stating that he was not a threat, Officer McAtee asked Defendant whether he was prohibited, whether Defendant was a felon or whether Defendant was a domestic abuser. (*Id.* at 22:15-22.)

In his testimony, Officer McAtee stated that when he was talking to Defendant after adjusting Defendant's handcuffs, he was not attempting to interview Defendant. (McAtee Hr'g Test. at 56.) Officer McAtee also testified that he knew Officer Mosher had read Defendant his *Miranda* rights, but did not know whether Defendant had invoked his right to remain silent. (*Id.* at 60.)

Defendant's loquacity, as evidenced by Government Exhibits 1-3, makes this a somewhat complicated situation. Although Defendant had invoked his right to remain silent, he was far from silent. While in the back of the patrol car Defendant made unprompted statements regarding not being a threat, that his wife had a gun for protection, that she left the firearm with him when she went to get the correct pizza, and that he had not assaulted anyone. Officer McAtee responded to some of Defendant's statements noting that he was unaware of Defendant ever assaulting anyone and telling Defendant that being a gunowner included being a responsible gunowner. Because these statements were spontaneous and were initiated by Defendant, not Officer McAtee, I find that Defendant's *Miranda* rights were not violated, and I recommend that Defendant's motion to suppress as related to these statements should be denied. *See United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) ("*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the

---

not recommending Defendant's question "What's not responsible about what we're doing?" and explanation that immediately follows be excluded.

investigating officers or during a conversation not initiated by the officers.") (Quoting *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir.1997)).

Turning to Officer McAtee's questions regarding whether Defendant was prohibited, a felon, and/or a domestic abuser, these questions are more problematic. Officer McAtee knew that Officer Mosher read Defendant his *Miranda* rights. Officer McAtee did not know whether Defendant invoked his *Miranda* right and also admitted that he did not ask Officer Mosher whether Defendant invoked his rights. (McAtee Hr'g Test. at 61.) Officer McAtee also knew that Defendant was intoxicated and based on previous dealings with Defendant knew that he was talkative. Unlike his replies to Defendant's unprompted statements discussed above, Officer McAtee's questions regarding whether Defendant was prohibited, a felon, and/or a domestic abuser appear to be "express questioning and words or conduct that officers should know [are] reasonably likely to elicit an incriminating response from the suspect." *Jones*, 842 F.3d at 1082 (alteration in original) (quotation omitted). Defendant denied being prohibited, a felon, and/or a domestic abuser. After these denials, Officer McAtee closed the patrol car door and ceased conversing with Defendant. Defendant's continued rambling discourse after invoking his right to remain silent and Officer McAtee's failure to confirm whether Defendant had invoked his right to remain silent before questioning Defendant on his prohibited status makes this a close case.

In supplemental briefing, the Government cites *United States v. Adams*, 820 F.3d 317 (8th Cir. 2016) for the proposition that Defendant "waived any invocation of his [Fifth Amendment] rights." (Doc. 36 at 2.) In *Adams*, the defendant was arrested for armed bank robbery on August 16, 2013. *Id*. at 320. On August 30, 2013, an FBI special agent interviewed the defendant at the jail. *Id*. The FBI agent advised the defendant of his *Miranda* rights. *Id*. Following the reading of his *Miranda* rights the defendant and FBI agent had the following exchanges:

After stating each right, [the FBI agent] asked [the defendant] whether he understood, and [the defendant] indicated that he did. [The FBI agent] asked [the defendant] to sign his name at the bottom of the form, indicating that he understood his rights, but [the defendant] refused to do so, stating that he did not understand why he was being questioned and that he did not like "dealing with cops." [The FBI agent] informed [the defendant] that he could refuse to answer questions, could choose to answer some questions but not answer others, and could terminate the interview at any time. Approximately three minutes and forty seconds into the interview, [the FBI agent] asked [the defendant] if he wanted to answer questions. The two then had the following exchange:

[DEFENDANT]: No, I don't think I wanna, you know—
[FBI AGENT]: I'll explain what's going on. We've got you in the . . . bank. We've talked to a lot of people and collected a lot of information. And that's why you're here, for robbing the bank.

Approximately six minutes into the interview, [the defendant] stated:

[DEFENDANT]: I was at my girlfriend's Rebecca's—
[FBI AGENT]: Okay, so you were—
[DEFENDANT]: Nah, I don't want to talk, man. I mean, I—
[FBI AGENT]: Okay, so you were saying you were at your girlfriend Rebecca's house.—
[DEFENDANT]: I mean—
[FBI AGENT]: That's where the problem is, okay, because we know you weren't at your girlfriend Rebecca's house.—
[DEFENDANT]: I just, I just, I just wanna, you know what I'm saying?—
[FBI AGENT]: Okay, okay, that's fine, but just so you know, your alibi of being at Rebecca's house all day, every second—
[DEFENDANT]: No, I wasn't there all . . . I wasn't there all day.
[FBI AGENT]: Okay.

The interview continued for approximately sixteen additional minutes, during which time [the defendant] made statements that he was innocent, that he was not a "rat," and that he had sold his white Dodge Durango SUV before the robbery occurred.

*Id.* at 320-21.  The defendant moved to suppress his statements to the FBI agent, arguing that the statements were obtained in violation of *Miranda*.  *Id.* at 321.  The Eighth Circuit addressed the defendant's argument as follows:

> [The defendant] argues that the district court clearly erred when it found that [the defendant's] statement, "I don't want to talk, man," was not an unequivocal invocation of his right to remain silent.  During an interrogation, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602.  "To adequately invoke this right and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'" *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995) (quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir.1989)).  "We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent."  *Id*.  After [the defendant] said "Nah, I don't want to talk, man.  I mean, I," he immediately proceeded to engage in an exchange with [the FBI agent].  The phrase "I mean" signaled that [the defendant] intended to clarify the statement, "I don't want to talk, man," and the statement was therefore ambiguous.  *See United States v. Havlik*, 710 F.3d 818, 822 (8th Cir.2013) (holding that the statement "I guess you better get me a lawyer then" was not an unequivocal invocation of the right to an attorney because the phrase "I guess" was equivocal).  [The defendant] thereafter continued to talk with [the FBI agent] for an additional sixteen minutes, never clarifying his earlier statement or otherwise unequivocally invoking his right to remain silent.  In light of these circumstances, the district court did not commit clear error in finding that [the defendant] had not indicated a clear, consistent expression of a desire to remain silent.
>
> [The defendant] argues that the district court also clearly erred in finding that he impliedly waived his *Miranda* rights when he answered [the FBI agent's] questions.  He claims that the circumstances surrounding his interrogation demonstrate that he did not intend to waive his right to remain silent.  Those circumstances include his refusal to sign the FBI's form, his statement that he did not like talking with law enforcement, and his assertion of his right to remain silent during the August 16 interview.  We disagree.  Waiver of the right to remain silent "can be clearly inferred from the actions

23

and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). [The defendant] does not dispute that he was informed of his rights or that he understood them. When [the defendant] made uncoerced statements to [the FBI agent], he engaged in a course of conduct indicating waiver. The circumstances to which he cites do not overcome the fact that he understood his *Miranda* rights and nevertheless chose to speak to [the FBI agent]. *See id*. at 386, 130 S.Ct. 2250 ("The fact that Thompkins made a statement about three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver."). The district court therefore did not err in concluding that [the defendant] had waived his *Miranda* rights.

*Id*. at 322-23.

The instant case is distinguishable from *Adams*. First, Officer McAtee did not advise Defendant of his *Miranda* rights. While Officer McAtee was aware that Officer Mosher had read Defendant his *Miranda* rights, Officer McAtee did know whether Defendant invoked his rights. Second, unlike *Adams*, Defendant was unequivocal in invoking his right to remain silent. After reading Defendant his *Miranda* rights, Officer Mosher asked, "Having those rights in mind, do you want to tell me what's going on tonight." (Gov. Ex. 2 at 14:54-55.) Defendant responded, "No . . . because I tried to tell you . . . but now I'm under arrest. I have nothing to say." (*Id*. at 14:56-15:06.) Unlike in *Adams*, "I have nothing to say" is a clear statement by Defendant invoking his *Miranda* rights. Third, Defendant was intoxicated and Officer McAtee was aware of Defendant's reputation for loquacity. Defendant's unprompted statements prior to Officer McAtee's questioning were spontaneous and not in response to questioning by law enforcement. Unlike *Adams*, under these circumstances, Defendant did not clearly waive his *Miranda* rights.

24

Thus, considering all the foregoing circumstances, I recommend that Defendant's statements to Officer McAtee's questions regarding whether Defendant was prohibited, a felon, and/or a domestic abuser should be suppressed. Specifically, Defendant's statements, of "No" to each of Officer McAtee's questions of whether Defendant was prohibited, whether he was a felon, and whether he was a domestic abuser and Defendant's further statement in regard to whether he was a domestic abuser that "me and my wife have been married 19 years, I never" should be suppressed. *See* Gov. Ex. 3 at 22:15-26.

Finally, Defendant's unprompted statements and questions to Officer Mosher on the drive from the apartment complex to the police station, *see* Gov. Ex. 1 at 24:46-34:06, like the initial unprompted statements Defendant made to Officer McAtee while Officer McAtee was adjusting Defendant's handcuffs, were spontaneous and initiated by Defendant and therefore did not violate *Miranda*. Accordingly, I recommend that Defendant's motion to suppress as related to these statements should be denied.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **grant in part and deny in part** Defendant's Motion to Suppress as discussed above. **(Doc. 26.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to

appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 21st day of April, 2025.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa