# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

EDWARD DEWAYNE HODGES,

        Defendant.

No. 24-CR-106-CJW-MAR

**ORDER**

---

## I.    INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R") (Doc. 38) by the Honorable Mark A. Roberts, United States Magistrate Judge, recommending the Court grant in part and deny in part defendant's Motion to Suppress (Doc. 26). Defendant is charged with one count of Possession of a Firearm by a Felon in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(8).  (Doc. 3).

On February 3, 2025, defendant filed a motion to suppress and a supplement to that motion.  (Docs. 26 & 28).  The supplement contained an inventory of items to be suppressed which includes all statements defendant made after he was removed from his apartment building on September 6, 2024.  (Doc. 28); *see also* (Doc. 34, at 2) ("The government clarified with defendant that he is seeking suppression of all statements made after defendant entered his apartment building after the initial conversation with law enforcement in front of another door to the apartment complex.").  The government timely filed a resistance.  (Doc. 34).  On March 12, 2025, Judge Roberts held a hearing on the motion.  (Doc. 35).  On April 21, 2025, Judge Roberts issued his R&R, which recommends that the Court grant in part and deny in part defendant's motion.  (Doc. 38).  On May 5, 2025, defendant timely filed an Objection to the R&R.  (Doc. 41).  For the

following reasons, defendant's Objection (Doc. 41) is **overruled**, the R&R (Doc. 38) is **adopted** and defendant's Motion to Suppress (Doc. 26) is **granted-in-part and denied-in-part**.

## II.     STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[ ] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the Court reviews the disputed portions of Judge Roberts' R&R novo.

Any portions of a report and recommendation to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence

2

is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A district judge may, however, elect to review a report and recommendation under a more exacting standard even if no objections are filed. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985).

## III.    DISCUSSION

Defendant does not object to Judge Roberts' account of the relevant facts, only his legal analyses and conclusions based on those facts. The Court therefore incorporates Judge Roberts' findings of facts in the R&R as if fully set forth here. (Doc. 38, at 2–7). When relevant, the Court will rely on and discuss the facts in conjunction with its de novo review of the legal issues.

First, defendant contends that "he was subjected to custodial interrogation after he was seized outside his apartment building and that this custodial interrogation occurred without the benefit of *Miranda* warnings." (Doc. 41, at 8). Defendant accordingly objects to Section III(A)(3) of the R&R, where Judge Roberts concluded defendant "was detained on his front stoop pursuant to a *Terry* stop, not pursuant to a custodial interrogation" and thus his statements were not obtained in violation of *Miranda*. (Doc. 38, at 13).

Second, defendant contends that "he invoked his right to remain silent while seated in the back of the police vehicle, and that his invocation was not 'scrupulously' honored by law enforcement." (Doc. 41, at 9). Defendant accordingly objects to Section III(B)(3) of the R&R, where Judge Roberts analyzed the various statements defendant made after being placed in the back of the squad car and determined whether they should be suppressed. (Doc. 38, at 18–25). Presumably, defendant does not object to Judge Roberts' recommendation that certain of defendant's statements should be suppressed— specifically, defendant's answers of "No" to each of Officer McAtee's questions as to

3

whether defendant was prohibited, whether he was a felon, and whether he was a domestic abuser, as well as his further statement about whether he was a domestic abuser, "Me and my wife have been married nineteen years, I never." (*Id.*, at 25). The Court takes defendant's objection to be directed instead, of course, to Judge Roberts' recommendation *not* to suppress defendant's various other statements, which he made before and after the statements Judge Roberts recommended be suppressed.

In short, defendant maintains—just as he argued in his motion—that suppression is necessary for every statement he made after reemerging from his residence following his initial encounter with police.

### A.     *Credibility of Officer Mosher*

Defendant's pleading contains a section entitled "Objections" in which he raises the two objections mentioned above. (Doc. 41, at 7–8). In that section, defendant does not explicitly object to Judge Roberts' finding that Officer Mosher was credible when he testified at the suppression hearing. Elsewhere, however, defendant asserts that "[a]ny deference to [Officer Mosher]'s credibility is undermined by his attempt to deny that he was frustrated by the Defendant's behavior toward him." (*Id.*, at 6). Defendant also asserts that Officer Mosher's "hesitance to admit that the Defendant invoked his right to remain silent further undermines [Judge Roberts'] finding of credibility." (*Id.*, at 6 n.1). To the extent defendant objects to Judge Roberts' finding that Officer Mosher was credible, the Court will address it here.

As the Court of Appeals for the Eighth Circuit has explained,

[O]nce a party makes a proper objection to a magistrate's finding, including a credibility finding, the district court *must* make a de novo determination of that finding. *Calderon v. Waco Lighthouse for the Blind*, 630 F.2d [352, 356 (5th Cir. 1980)]. The court need not conduct a de novo hearing, [*Raddatz*, 447 U.S. at 673–76], but must nonetheless make a de novo determination of that finding based on the record. *Calderon*[,] 630 F.2d at 356; *see Branch v. Martin*, 886 F.2d [1043, 1045 (8th Cir. 1989)]

4

(objections to magistrate's credibility determinations); *Cay v. Estelle*, 789 F.2d 318, 327 (5th Cir. 1986) (de novo review of full credibility assessments made by magistrate requires consideration of verbatim record of evidentiary hearing[.]).

*Taylor v. Farrier*, 910 F.2d 518, 521 (8th Cir. 1990) (emphasis in original); *see also Branch*, 886 F.2d at 1045–46 (holding district judge erred by failing to either read the transcript of evidentiary hearing or listen to tape recording thereof when party objected to magistrate judge's assessment of the credibility of witnesses).

The Court has reviewed the transcript of the hearing before Judge Roberts in its entirety, including the testimony of Officer Mosher. *See* (Doc. 37, at 7–50). The Court finds nothing to render Officer Mosher's testimony or reliance thereon dubious. One exchange between defense counsel and Officer Mosher, to which defendant draws attention, occurred as follows:

> Q.      . . . After you Mirandized Mr. Hodges, in the back of the police vehicle, he then invoked his right to remain silent, correct?
>
> A.      I guess, what do you mean by that?
>
> Q.      So you Mirandized him about 14 minutes and 55 seconds in the back of the police vehicle, and you asked him whether he wanted to ask any -- or answer any questions, correct?
>
> A.      I believe he told me no.
>
> Q.      Meaning he did not want to answer any questions?
>
> A.      If that's what you're inferring by it. I just -- he just told me, no, he didn't want to talk to me.
>
> Q.      You're saying that's all he said?
>
> A.      In that moment, yes.
>
> Q.      Okay. I'm going to play for you the back of your police vehicle, about 15 minutes and 48 seconds into Exhibit 1. And it reflects about -- it looks like 8:49 p.m. and 9 seconds on the time stamp.
>
>         (Whereupon, the recording was played.)

5

BY MR. NATHAN:

Q.      Okay. So you're right.  Initially, he said, no, he did not want to answer any questions.  Right?

A.      Yes.

Q.      And then after that, he explained why.  And then he went further and said that he no longer wanted to answer any questions; is that correct?

A.      Yes.

Q.      Okay.  So Mr. Hodges invoked his right to remain silent?

A.      Okay, yes.

(Doc. 37, at 17–18).

This exchange suggests, at most, that Officer Mosher was skeptical of adopting defense counsel's broad assertion that, as a legal conclusion, defendant invoked his right to remain silent after being Mirandized.   Officer Mosher sought clarification, and clarification ensued, revealing that defense counsel was referring to specific statements uttered by defendant—statements which Officer Mosher then agreed constituted an invocation.   These statements were, however, far from the only statements defendant uttered "after" being Mirandized.   Given that those additional statements did not constitute an invocation, Officer Mosher's reluctance to concede the broad assertion is therefore understandable, and the exchange by which clarification was obtained does not, as defendant suggests, undermine Officer Mosher's credibility as a witness.   To the contrary, it demonstrates, if anything, Officer Mosher's concern with accuracy and precision in providing testimony.

Defendant next argues that Officer Mosher's credibility is dubious because cross-examination revealed that he is "not the stoic he testified he was, rather, he gets frustrated like everyone else."  (Doc. 41, at 6).  The exchange defendant cites in support of this assertion occurred as follows:

6

Q.     But the only impetus here that I saw for you to put him in the car was him saying, "Don't Mirandize me," right?

A.     Well, we had -- I -- go ahead.

Q.     I'll ask it differently.

A.     Yes.

Q.     If he had not said -- if he had allowed you to Mirandize him, you would not at that point have put him in the back of the police car, correct?

A.     Correct.

Q.     Okay. I guess I'm confused, because earlier you had said that you are impartial and you don't get frustrated by defendants when they say, "You're harassing me. I don't have time for you." But it looked like you were frustrated there. Am I wrong?

A.     What do you mean?

Q.     When he said, "Don't Mirandize me."

A.     Well, at that point, I just felt like there was -- the investigation with him right there in the field was not going to go any further.

Q.     Uh-huh.

A.     And so that's why we're like, "All right. Fine. We're just going to arrest him on the charges that we have."

Q.     So I watched the video. And you said you watched it too, right?

A.     Yes.

Q.     You're saying you weren't frustrated there?

A.     I mean, at that point, I probably was. I don't know about beforehand, but –

Q.     So you aren't this impartial person who is immune to people calling you a harasser and things like that. In fact, what triggered you here was him saying, "Don't Mirandize me," right?

A.     Then I decided to arrest him, yes.

Q.     Okay. Because he frustrated you?

A.     Because the investigation wasn't going any further.

7

Q.      Because the investigation was frustrated?

A.      What do you mean?

Q.      Well, I'm just saying instead of you being frustrated, you're saying it was the investigation that was frustrated?

A.      I mean, I guess -- I mean, I guess you can say that I was -- I was done with the investigation.

(Doc. 37, at 43–45).

Here, again, Officer Mosher seems to be seeking clarification in attempt to resolve what amounts to a dispute of semantics. Defense counsel insists with Officer Mosher that the latter was "frustrated" by defendant's behavior, implying and urging Officer Mosher to agree that he became frustrated in the sense that "to be frustrated" means developing upset emotions. Officer Mosher, in response, maintains that defendant's conduct "frustrated" him, as he attempted to carry out an investigation, in the sense that "to be frustrated" means to be impeded. This is not inconsistent with his earlier testimony explaining that, although he prefers cordial interactions with individuals treating him with respect, he is ultimately impartial to comments lodged at him on the job, and he did not become "frustrated" by defendant's accusations of harassment. (Doc. 37, at 24–27). In sum, the Court finds nothing to undermine Officer Mosher's credibility as a witness. To the extent defendant objects to Judge Roberts' finding of credibility, that objection is overruled.

> **B.      Whether the Interaction on Defendant's Front Stoop Required *Miranda Warnings***

Defendant maintains that after he retreated into his residence following his initial encounter with police, Officer Mosher commanded him to return outside where, on the front stoop, officers seized him and, knowing of his penchant for rambling, began to lodge questions and accusations at him without the benefit of *Miranda* warnings in an attempt to elicit incriminating statements—this interaction constituting an unlawful

custodial interrogation, requiring suppression of all his statements. (Doc. 41, at 1–6, 8). Defendant argues that the fact that Officer Mosher eventually felt compelled to attempt to Mirandize defendant while they remained on the front stoop—which defendant describes as "the functional equivalent of an interrogation room"—shows that the entire interaction had been a custodial interrogation from the jump, and Officer Mosher knew it. (*Id.*, at 5–6).

The relevant legal principles here are concisely set out in *United States v. Pelayo-Ruelas*, 345 F.3d 589 (8th Cir. 2003), where the Eight Circuit explained as follows:

> In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a law enforcement officer, prior to conducting custodial interrogation, must advise the suspect of his right to be free from compulsory self-incrimination and to the assistance of counsel. Following *Miranda*, the Supreme Court held in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), that a police officer with reasonable suspicion that criminal activity is afoot may briefly detain a suspect to investigate the circumstances giving rise to that suspicion.

> In *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S. Ct. 3138, 82 L.Ed.2d 317 (1984), a traffic stop case, the Court discussed the interaction between the custodial interrogation principle of *Miranda* and the brief-detention-to-investigate principle of *Terry*:

>> The [*Terry*] stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purpose of Miranda.

9

(Quotation and citation omitted.) Citing *Berkemer*, we have declared that, "No Miranda warning is necessary for persons detained for a *Terry* stop." *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir.1986), followed in *United States v. Johnson*, 64 F.3d 1120, 1125–26 (8th Cir.1995), *cert. denied*, 516 U.S. 1139, 116 S. Ct. 971, 133 L.Ed.2d 891 (1996). Thus, we reject as contrary to this controlling authority [the] broad contention that a person is in custody for *Miranda* purposes whenever a reasonable person would not feel free to leave. One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights.

345 F.3d at 591–92 (second alteration added).

The key question here is, then, whether defendant's detention on his front stoop constituted only an investigative *Terry* stop, not requiring *Miranda* warnings, or instead at any point curtailed defendant's freedom to the degree associated with formal arrest, triggering his *Miranda* rights. "There is no clear line between investigative stops and de facto arrests." *United States v. Sanford*, 813 F.3d 708, 712 (8th Cir. 2016) (citing *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013)). That hazy line is crossed, however, "when the officer's conduct is more intrusive than necessary for a *Terry* investigative stop," at which point the detention becomes a de facto arrest. *Id.* (citing *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994)); *see also Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021) (quoting *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011)) ("[A]n initially reasonable investigative stop can become unreasonable if it was 'excessively intrusive in its scope or manner of execution.'").

The Eighth Circuit considers five main factors in determining whether a *Terry* stop has transformed into an arrest, as follows:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack

10

of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Childers*, 73 F.4th 960, 963 (8th Cir. 2023) (quoting *United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022), in turn quoting *Pollreis*, 9 F.4th at 745).

The Eighth Circuit has further advised that the "[u]se of handcuffs . . . does not automatically turn an investigative stop into a de facto arrest." *United States v. Halverson-Wease*, 30 F.4th 760, 765 (8th Cir. 2022). "Officers may use handcuffs during an investigative stop if they have 'some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose.'" *Id.* (alteration omitted) (quoting *Pollreis*, 9 F.4th at 745). In *Pollreis*, the Eighth Circuit briefly surveyed its caselaw to illustrate the proposition that use of handcuffs does not necessarily transform an investigative stop into a de facto arrest, explaining as follows:

> For example, in *El-Ghazzawy*, we held that using handcuffs transformed the stop into a de facto arrest because (1) the officer had no indication that the man was dangerous, (2) the suspected crime did not involve a weapon, (3) the man did not act suspiciously, (4) the officer failed to conduct any investigation before handcuffing the suspect, and (5) there were no exigent circumstances. 636 F.3d at 457–58. But in *Waters* [*v. Madson*, 921 F.3d 725 (8th Cir. 2019)], we held that handcuffing and placing a non-compliant individual in a squad car for twenty minutes was not a de facto arrest. 921 F.3d at 738. More recently, in *Chestnut* [*v. Wallace*, 947 F.3d 1148 (8th Cir. 2020)], we held that handcuffing a mostly compliant individual for twenty minutes was not a de facto arrest, even after police frisked the individual and found no weapons. 947 F.3d at 1088.

9 F.4th at 745–46.

The *Pollreis* court found that a de facto arrest had not occurred when an officer ordered two minor boys to the ground at gunpoint while searching for two male suspects, stood over them for nearly two minutes with his gun pointed at them, and then officers placed the boys in handcuffs for an additional two minutes. *Id.* at 746. While the first officer initially stood over the boys with his gun pointed at them, one of the boys moved

11

his hand behind his back and touched his waist to adjust his shirt, at which point officers handcuffed both boys. *Id.* at 742, 746. One officer knew that a male suspect for whom police were searching usually carried a weapon. *Id.* at 746.

The *Pollreis* court concluded that the handcuffing was reasonably necessary to effectuating the investigative stop, which did not rise to a de facto arrest, based on the boy's hand movements and the tip that the male suspect usually carried a weapon. *Id.* The court noted that even though the boys were "mostly compliant"—a fact which would tend to make a handcuffing rise to the level of arrest—"compliance is only one factor, albeit an important one, in the totality-of-the-circumstances analysis." *Id.* *See also United States v. Bonilla*, 86 F.4th 1196, 1199–1200 (8th Cir. 2023) (finding that even though there was no indication the defendant was armed, handcuffing him to conduct an investigative stop was "necessary for a legitimate purpose," not rising to the level of arrest, because officers had a legitimate concern he might try to flee based on "the change in [his] demeanor over a short period of time, the perceived attempt to discard contraband outside the presence of the officers, and . . . other factors that aligned at least in part with drug-trafficking behavior"); *Johnson*, 31 F.4th at 623 (finding officers reasonably needed to draw weapons and handcuff the defendant to effectuate an investigative stop based on knowledge the defendant could be armed plus his flight and noncompliance before the stop, collecting cases showing that "our precedent permits using these methods of force together [i.e., handcuffs and drawn weapons] without automatically transforming a *Terry* stop into an arrest").

Here, there is no question that the officers had reasonable suspicion that "criminal activity may be afoot" sufficient to conduct an investigative stop with defendant. Officers observed a firearm on the stoop where he had been seated immediately after defendant, who appeared intoxicated, stood up and walked away. Furthermore, the officers were justified in using handcuffs to detain defendant to conduct the investigative stop. Given

that defendant was seen with a firearm immediately beforehand, officers had a reasonable belief that he could armed and dangerous and that handcuffing was necessary for officer safety. Given also that he appeared intoxicated and of a comportment which could be described as boisterous, agitated, and not inclined to easily cooperate, officers also reasonably believed handcuffing was alternatively necessary due to his unpredictability and unruliness in order to maintain the status quo.

As for whether, once defendant was in handcuffs, the interaction ever rose to the level of a de facto arrest, the five factors set out in *Childers*, 73 F.4th at 963, suggest it did not. Although the Court's review is de novo, the Court finds Judge Roberts' analysis to be entirely accurate and worth quoting. He rightly put it as follows:

> Only two officers were involved, Defendant was found in possession of a firearm and was intoxicated, the officers' articulable and objective suspicions were strong, and such circumstances required immediate action. Thus, factors one, two, three, and five support finding that the stop did not rise to the level of an arrest. Factor four, observance of erratic behavior and suspicious movements by Defendant is a closer call. Defendant was agitated and intoxicated. His commentary veered from topic to topic and interrupted others. On the other hand, the evidence tends to show that the officers were familiar with Defendant and his behavior was consistent with past interactions. This factor is, at best, neutral and does not support the finding that the *Terry* stop rose to the level of an arrest before the Defendant's arrest was announced.

(Doc. 38, at 14). The Court adds that police officers never drew their weapons or threatened to do so, nor did they present any other show of force, and the entire interaction on the stoop lasted approximately only ten minutes, with defendant in handcuffs for nine of those minutes, until he was formally arrested and taken into the squad car. *Cf. Waters*, 921 F.3d at 738 (handcuffing and placing a non-compliant individual in squad car for twenty minutes not a de facto arrest); *Chestnut*, 947 F.3d at 1088 (handcuffing a mostly compliant individual for twenty minutes not a de facto arrest, even after police frisked and found no weapons on him).

13

Furthermore, Officer Mosher's statements and questions to defendant—interjected variously over, and during momentary lulls in, the latter's spirited diatribes—were consistent with "ask[ing] the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions," here concerning whether defendant was prohibited from possessing a firearm. *Pelayo-Ruelas*, 345 F.3d at 592 (quoting *Berkemer*, 468 U.S. at 439). The Court also notes several persuasive cases from other districts, cited by Judge Roberts, which lend considerable support to his ultimate conclusion—with which the Court agrees—that Officer Mosher's questioning prior to placing defendant in the squad car "was well within the purview of a *Terry* stop and a *Miranda* warning was unnecessary." (*Id.*, at 15–16) (citing *United States v. Demar*, No. 1:22-CR-00404-ELR-JEM-1, 2024 WL 937052, at *8 (N.D. Ga. Feb. 26, 2024), *Report and Recommendation adopted*, 2024 WL 1119388 (N.D. Ga. Mar. 14, 2024) (finding that *Miranda* warnings were unnecessary during a *Terry* stop where a law enforcement, officer after observing a firearm in the defendant's possession, asked the defendant whether he was a felon, to which the defendant responded, "yes"); *United States v. Thurman*, No. 1:21-cr-00151- CLC-CHS, 2022 WL 18396271, at *4 (E.D. Tenn. Dec. 12, 2022), *Report and Recommendation adopted as modified on other grounds*, 2023 WL 315529 (E.D. Tenn. Jan. 19, 2023) (finding that officer's questions during a valid *Terry* stop regarding the contents of the defendant's pockets, whether the defendant shot a gun, why defendant shot a gun, the location of the gun, whether the defendant possessed ammunition, and twice confirmed the defendant was a convicted felon did not require the officer to read the defendant *Miranda* rights and the questions were directly related to the officer's reasonable suspicion that the defendant was a felon in possession of a firearm and/or ammunition); *United States v. Middleton*, No. CRIM.A. CR205-025, 2006 WL 156872, at *3 (S.D. Ga. Jan. 19, 2006) (finding that officer's questioning that included asking whether the defendant was a convicted

14

felon, whether the defendant's rights had been restored, and who owned the gun, were lawful under *Terry*, and the defendant's answers to the questioning did not violate *Miranda* and were admissible)).

It is also important to note that the test of whether a person is in custody for purposes of *Miranda* is an objective one. That the officer believed it necessary at some point to attempt to Mirandize defendant does not mean defendant was in custody. It does not matter what the officer thought. The test is objective.

In sum, the Court finds, upon de novo review, that defendant's detention on the front stoop constituted only an investigative *Terry* stop, not requiring *Miranda* warnings. Thus, defendant's statements prior to his formal arrest need not be suppressed, and his objection maintaining the contrary is overruled.

### C.    *Defendant's Invocation of the Right to Remain Silent*

After Officer Mosher formally arrested defendant and placed him in the rear seat of the squad car, Officer Mosher read defendant his *Miranda* rights. Officer Mosher then asked defendant, "Having these rights in mind, do you want to tell me what's going on tonight?" Defendant promptly replied, "No." Officer Mosher confirmed, "No?" Defendant stated, "No, because I tried to tell you. But that was during your investigation. But now I'm under arrest. I have nothing to say." Officer Mosher then closed the rear passenger door, proceeded to enter the front passenger seat of the squad car, and began to investigate defendant's criminal history on a computer.

Approximately three-and-a-half minutes after Officer Mosher had Mirandized defendant, Officer McAtee, who had been standing outside the squad car, opened the rear passenger door at the request of defendant, who was complaining about his uncomfortable position due to his handcuffs. Officer McAtee proceeded to address defendant's problem by applying a second, looser-fitting set of handcuffs onto defendant, then removing the first set. After approximately two minutes, as this handcuff-changing

process neared completion, defendant spontaneously stated, "Listen to me man. It's like you guys – I mean. Listen to me, though. It seems like these Iowa police don't want me down here, man. 'Cause everything I do in the state of Iowa is a problem." Officer McAtee then asked defendant, "Do you want to sit up for me, that way you don't have to lay on that other hand?" Defendant responded, "No, it's cool now. It's cool now. It's loose now." Defendant proceeded to elaborate on how his arm felt better.

Officer McAtee then stated to defendant, "Now that you're cooperative, I was able to get a second handcuff on, but when you were being jittery up there, dude, we have to just throw one on." Defendant responded, "Man, it wasn't [inaudible] I was being jittery. Y'all just jumped all on me, man." Officer McAtee stated, "Dude, you're just yelling all the time." Defendant responds, "I mean come on, man, 'cause I'm a little aggravated and upset. I ain't hurt nobody. I mean, y'all done got a million calls about me in this apartment, with my music, I'm drinking. You hear me though? Y'all done got a million motherfuckin' calls. Who have I hurt? Who? Who have I assaulted?" Officer McAtee begins to respond, saying, "You haven't assaulted anybody that I know of," and defendant declares over him, "Zero," and proceeds to ask, "You listening to me, though?" Officer McAtee asks, "What's that?" Defendant repeats, "Zero."

Defendant then goes on to say, "Because me and my wife want to protect ourselves, there's a problem with that? We work every day." Officer McAtee then responds, "Part of being a gunowner is you've got to be a responsible one." Defendant says in reply, "What's not responsible about what we're doing? I wasn't out here waving around – ," and Officer McAtee interrupts, "Intoxicated with a gun?" Defendant proceeds, saying "I wasn't out here waving it around. She dropped that thing on me to go get a fuckin' pizza. She came out the house with her goddamn weapon, she said, 'Grab this, I'm finna go to the store, grab a fuckin' pizza.' She laid it on me. I forgot the goddamn thing was even there, man. I'm just talking seriously. And I walked off, I

16

forgot the goddamn thing was even fuckin' there." Officer McAtee responds, "Well I can see that. Yeah." Defendant states, "I'm just being serious, man. I'm no fucking threat, man."

Shortly after defendant concludes that he is not a threat, Officer McAtee asks defendant, "Are you prohibited at all?" Defendant responds, "No." Officer McAtee then asks, "You're not a felon or anything?" Defendant responds, "No." Officer McAtee then asks, "Domestic abuser?" Defendant responds, "No. Me and my wife have been married nineteen years. I never." McAtee responds, "Alright, I'm just asking." Officer McAtee then shuts the door.

As mentioned above, defendant presumably does not object to Judge Roberts' recommendation that certain of defendant's statements should be suppressed—specifically those set out in the preceding paragraph, i.e., defendant's answers of "No" to each of Officer McAtee's questions as to whether defendant was prohibited, whether he was a felon, and whether he was a domestic abuser, as well as his further statement in regard to whether he was a domestic abuser, "Me and my wife have been married nineteen years, I never." (*Id.*, at 25). Rather, the Court takes defendant's objection to be directed to Judge Roberts' recommendation *not* to suppress defendant's various other statements— those he made to Officer McAtee before the latter asked if he was prohibited, and those he made in the squad car en route to the jail.

"The Fifth Amendment requires suspects to be informed of their *Miranda* rights before any custodial interrogation." *United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016) (citing *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012)). "Interrogation, for Miranda purposes, means 'express questioning' and 'words or conduct that officers should know [are] 'reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (alteration in original) (quoting *United States v. Briones*,

390 F.3d 610, 612 (8th Cir. 2004), in turn quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

"During an interrogation, '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *United States v. Adams*, 820 F.3d 317, 322-23 (8th Cir. 2016) (alteration in original) (quoting *Miranda*, 384 U.S. at 473–74); *see also Jones*, 842 F.3d at 1083 ("Officers must stop questioning if a suspect clearly and consistently expresses a desire to remain silent."). "'To adequately invoke this right and effectively cut off questioning, a suspect must indicate "a clear, consistent expression of a desire to remain silent."'" *Adams*, 820 F.3d at 323 (quoting *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995), in turn quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir.1989)). "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for purposes of *Miranda*." *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007). A defendant's statements are considered "as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." *Adams*, 820 F.3d at 323 (quotation omitted).

A defendant may waive his or her right to remain silent and such waiver "'can be clearly inferred from the actions and words of the person interrogated.'" *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "'Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.'" *Id.* (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)).

"*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Crisolis-Gonzales*, 742 F.3d 830, 837 (8th

Cir. 2014) (quoting *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997)). Relatedly, "an officer's response to a defendant's question does not amount to an interrogation." *Id.* (citing *United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008)).

As an initial matter, the Court finds defendant clearly and unequivocally invoked his right to remain silent when, in response to Officer Mosher asking whether he wanted to share anything, defendant stated, "No." Officer Mosher confirmed, "No?" Defendant stated, "No, because I tried to tell you. But that was during your investigation. But now I'm under arrest. I have nothing to say." This was a clear invocation, and at that point, interrogation of defendant should have ceased.

Defendant, however, then requested help in the back of the squad car regarding his handcuffs, and Officer McAtee opened the rear passenger door. At the suppression hearing, Officer McAtee testified that he overheard Officer Mosher read defendant his *Miranda* rights, but he did not know whether defendant had invoked his right to remain silent. (Doc. 37, at 59). And as recounted above, the ensuing exchange between defendant and Officer McAtee was far from silent.

After defendant explained that his arm felt better, Officer McAtee stated to defendant, "Now that you're cooperative, I was able to get a second handcuff on, but when you were being jittery up there, dude, we have to just throw one on." Taken in context, the Court does not find this to be a statement reasonably likely to elicit an incriminating response. Nor does the Court find Officer McAtee's subsequent statement, after defendant denied being jittery—i.e., "Dude, you're just yelling all the time"—to be a statement likely to elicit an incriminating response, notwithstanding that defendant felt compelled to respond to it at length. At this point, defendant asked whom he had supposedly assaulted and asked if it was a problem that he and his wife wanted to protect themselves, impliedly with a firearm. Defendant asked these questions unprompted and thus initiated the conversation, into which joined Officer McAtee with his comment,

19

"Part of being a gunowner is you've got to be a responsible one." The Court finds that, in this context, Officer McAtee was not asking a question or attempting to elicit information from defendant, notwithstanding that defendant took it to be a question, retorting, "What's not responsible about what we're doing?" Officer McAtee responds with an answer—posed, it seems, based on his intonation, as another question— "Intoxicated with a gun?" The Court does not find, however, that this response amounted to an interrogation, either. Rather, it is simply an answer to defendant's question and part of the conversation defendant initiated. *See Crisolis-Gonzales*, 742 F.3d at 837 ("[A]n officer's response to a defendant's question does not amount to an interrogation."). Defendant then proceeds—again unprompted—to explain how the gun wound up with him on the stoop. In short, the above exchange did not turn into an interrogation, until it did. And indeed, it did. But it did only when Officer McAtee asked defendant whether he was prohibited, no sooner. Defendant's statements preceding this interrogation were spontaneous and unprompted, and Officer McAtee's responses to those statements did not violate defendant's invocation of his own right to remain silent.

Finally, although defendant's objection appears to be all-encompassing, presumably to include an objection to Judge Roberts' conclusion that statements defendant made in the squad car en route to the jail need not be suppressed, defendant does not explicitly address this issue. Indeed, Judge Roberts devoted relatively little space to this final issue in his R&R—and understandably so, as the Court likewise finds it a relatively easy issue to resolve. Defendant's various questions and statements made while traveling in the squad car were spontaneously initiated by defendant himself, unprompted by the officers. The Court concludes that these utterances also need not be suppressed. *Crisolis-Gonzales*, 742 F.3d at 837.

## IV. CONCLUSION

For these reasons, the Court **adopts** Judge Roberts' R&R. (Doc. 38). Defendant's Objection (Doc. 41) is **overruled** and defendant's Motion to Suppress (Doc. 26) is **granted-in-part and denied-in-part**.

**IT IS SO ORDERED** this 12th day of June, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa